**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

CAMBRIN BARNES,
ADC #147871                                                                    PLAINTIFF

v.                                          4:21CV00144-JTK

JARED BYERS, et al.                                                       DEFENDANTS

<u>**ORDER**</u>

Plaintiff Cambrin Barnes ("Plaintiff") filed a Motion for Summary Judgment.   (Doc. Nos. 68-71).   Defendants Jared Byers, Claudia Harris, Dexter Payne, and Rodney Ford (collectively, "Defendants") have responded.   (Doc. Nos. 77-79).   Defendants filed a competing Motion for Summary Judgment.   (Doc. Nos. 74-76, 87, 91, 92).   Plaintiff has responded.   (Doc. Nos. 80, 81, 82, 84, 115, 120).   In addition, Defendants have filed a Motion for Summary Judgment on the issue of exhaustion.   (Doc. Nos. 108-110).   Plaintiff has responded.   (Doc. No. 119).

For the reasons set out below, Defendants' Motion for Summary Judgment on the issue of exhaustion (Doc. No. 107) is DENIED as moot; Defendants' Motion for Summary Judgment on the merits (Doc. No. 74) is GRANTED; Plaintiff's Motion for Summary Judgment (Doc. No. 68) is DENIED, and Plaintiff's Complaint, as amended, is DISMISSED with prejudice.

**I.      Introduction—Plaintiff's Amended Complaint**

Plaintiff is incarcerated at the Maximum Security Unit of the Arkansas Division of Correction ("ADC").   He sued Warden Jared Byers, Assistant Warden Claudia Harris, Arkansas Division of Correction Director Dexter Payne, and Correctional Manager Rodney Ford in their personal and official capacities.   (Doc. No. 5 at 1-2).   Plaintiff alleges that he "spent 428 days straight in punitive isolation even though there is an established thirty day limit on the amount of time a prisoner can spend in punitive isolation."   (<u>Id</u>. at 4).   Plaintiff also alleges that while in

punitive isolation: he has only been allowed to have undershorts; his mattress is taken for 24 hours a day; for 234 of the 428 days he has been locked down for 24 hours without exercise; he had almost no access to the law library; he has been allowed only three five-minute showers a week; he is allowed to purchase commissary items only once a month with a $10 spending limit; there is no heat in winter and in summer the temperature reaches well into the 100s; he has been physically abused; he tried to kill himself; he has developed a chronic masturbation disorder; he has been denied access to news and current events; and his conditions of confinement are unsanitary.   (Id. at 4-5).   Plaintiff maintains Defendants violated his rights under the Eighth and Fourteenth Amendments;   he seeks damages and injunctive relief.   (Id. at 6).

## II.      Summary Judgment Standard

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate if the record shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.   See Dulany v. Carnahan, 132 F.3d 1234, 1237 (8th Cir. 1997).   "The moving party bears the initial burden of identifying 'those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Webb v. Lawrence County, 144 F.3d 1131, 1134 (8th Cir. 1998), quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (other citations omitted).   "Once the moving party has met this burden, the non-moving party cannot simply rest on mere denials or allegations in the pleadings; rather, the non-movant 'must set forth specific facts showing that there is a genuine issue for trial.'"   Id. at 1135.   Although the facts are viewed in a light most favorable to the non-moving party, "in order to defeat a motion for summary judgment, the non-movant cannot simply create a factual

dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit." Id.

### III.    Background

Plaintiff received 23 major disciplinaries between December 31, 2019 and March 5, 2021. (Doc. No. 74-5 at ¶ 7; Doc. No. 74-8).   He was sentenced to 30 days in punitive isolation in connection with 14 of the 23 disciplinaries.   (Doc. No. 74-5 at ¶ 7; Doc. No. 74-8).

Administrative Regulation 839, applicable to all ADC inmates, defines punitive segregation as "[a] status of confinement that entails separation from the general population for inmates found guilty of committing serious rule violations."   (Doc. No. 74-3 at 1). Administrative Regulation 839 explains that the "[s]pecific procedures to be followed for the operation of punitive segregation shall be listed in the appropriate administrative directive(s)." (Id. at 2).

Administrative Directive 19-27 explains the ADC's policy regarding punitive isolation. (Doc. No. 74-4).   Pursuant to AD 19-27, an inmate who was found guilty of violating departmental rules or regulations may be placed in punitive housing after an appropriate hearing. (Id. at 1).   The Directive defines 48 hour relief as follows:   "An inmate in punitive housing will receive a 48 hour period after each 30 days of being housed in punitive isolation, unless the inmate is released to another area."   (Id. at 2).   ADC 19-27 includes the following punitive restrictions:

> When an inmate is found guilty of a major infraction of institutional rules and punitive housing time is imposed; the inmate may be placed in punitive housing or placed on punitive restriction and be subject to the limitations of  that assignment. Any exception or deviation from this policy must be authorized by the Director.
>
> 1. Mail – Inmates in punitive housing or on punitive restriction will be allowed to send and receive letters on the same basis as inmates in the general population. This will include both general and privileged correspondence.

2. Newspapers/Magazines – Inmates will not be able to receive newspapers or magazines in punitive housing or on punitive restriction. During their forty-eight (48) hour relief, inmates will be allowed to receive the two (2) most current newspapers and magazines on a one-for-one exchange basis.

3. Visitation – Inmates in punitive housing or on punitive restriction have opportunities for visitation unless there are substantial reasons for withholding such privileges. Visits will be conducted for two (2) hours, once a month (calendar) and scheduled at least twenty-four (24) hours in advance. The Warden or designee must approve all such visits. Approval will be contingent upon but not limited to:

      a. Nature of rule violation.

      b. No further rule violations while housed in punitive housing or on punitive restriction.

      c. Satisfactory cell inspection reports.

      d. A legal visit may be approved in advance by the Warden/Center Supervisor. This is only to be done when the attorney can justify the urgency of the legal matter prior to the release from punitive status, with the consistent need for good security.

4. Exercise – Inmates in punitive housing or on punitive restriction will be offered a minimum of one (1) hour of exercise per day outside of their cells, five (5) days per week, unless security or safety considerations dictate otherwise.

      a. The exercise periods are to be conducted outside, security and weather permitting. During inclement weather, coats and raincoats are available.

      b. During these exercise periods, the inmate will not be afforded any recreational equipment, television, or radio.

      c. Exercise periods should be documented. Any imposition of constraint during the exercise period will be justified and documented.

      d. Inmates on restricted recreation will remain in restraints during these periods, but may exercise in the punitive housing cell.

5. Commissary- Inmates on forty-eight (48) hour relief will be allowed to purchase commissary items, authorized personal hygiene items and legal supplies listed in the Personal Property Section of this policy a minimum of once every thirty (30) days. Purchase limit shall not exceed ten dollars ($10.00). Legal supplies may be purchased more often if the inmate can document a valid need. Inmates violating any restrictions will be subject to additional disciplinary action.

6. Mattresses – Inmates in punitive housing will not be allowed to have mattresses in the cells between the hours of approximately 7:00 a.m. and 7:00 p.m. daily.

7. Showers – Males inmates in punitive housing will be afforded the opportunity to shave and shower a minimum of three (3) times per week. Female inmates will be afforded the opportunity to shave once a week and shower a minimum of three (3) times per week.  Exceptions are permitted when found necessary by the senior officer on duty. All exceptions will be recorded in the log and justified in writing.

8. Law Library – After having been in punitive housing for twenty days, inmates may order legal materials from the law library if just cause or adequate need arises for legal material to be delivered once per week.
**EXCEPTION: Legal materials will be made readily accessible to those inmates who need to meet statutory or court-imposed deadlines.**

9. Personal Property – Inmates sentenced to punitive housing are not allowed personal property; thereby, personal property will be inventoried in accordance with appropriate policy addressing inmate property control. While in punitive housing, the inmate will only be allowed to have the following items, contingent upon security considerations.

a. Legal materials/Religious text – only that amount of legal material which can be kept neat and orderly and does not clutter the cell, plus one religious text (i.e., Bible, Koran, etc.)

      b. Soap

      c. Dental Hygiene Items

      d. Wash Cloth

      e. Self-improvement Reading Materials Provided by Treatment Services (one)

      f. Comb (no pick)

      g. Deodorant

      h. Sanitary Napkins (females)

      i. Paper

      j. Flex pen

k. Stamped Envelopes/Legal Envelopes

l. Shampoo (female inmates only)

m. Conditioner (female inmates only)

n. Consumable items (during forty-eight (48) hour relief only)

o. Medications as authorized in Paragraph #18

Toilet paper will be issued in increments by the punitive area supervisor on an as-needed basis.

10. Telephones – Inmates will not be afforded telephone privileges. Inmates may make attorney calls when a need can be verified that will not wait until the conclusion of punitive confinement.

11. Religious Services – Inmates in punitive housing will not be allowed to participate in group religious activities. A religious leader approved by the Department will be available upon request for one-on-one visits, at the inmate's cell, subject to approval by the Warden. A departmental chaplain must make rounds in punitive housing at least once per week.
Provisions will be made for Muslim inmates to participate in the Ramadan Fast.

12. Meritorious Good Time – Inmates in punitive housing or on punitive restriction will not earn good time.

13. Work Assignment – Inmates in punitive housing will not have work assignments.

14. Library – Inmates in punitive housing will not have regular library privileges.

15. Program Activities – Inmates in punitive housing will not be allowed to participate in any group program activities (i.e., Inmate Council, SATP, Education, Movies, etc.).

16. Clothing – Inmates in punitive housing will be provided one jump suit and appropriate undergarments at shower time. The only footwear permitted will be state issued canvas or approved medical footwear.

17. Paper and Pen – Inmates in punitive housing will be allowed to purchase flex pens and/or paper through the commissary at least once monthly or more often if a need is documented and validated. The Restricted Housing Supervisor or Chief Security Officer will review all such requests.

6

18. Medical – All inmates who are segregated from the general population will be evaluated by qualified health personnel prior to placement in punitive isolation and daily rounds will be made in punitive housing areas by medical staff. The pre-placement health evaluation is to ensure the inmate does not have any medical conditions contradictory to such placement, and to screen for mental health referrals. Any referrals to mental health shall be made to the mental health supervisor and/or the on-call mental health staff. The pre-placement will be documented in the inmate's health record.

Sick call and pill call will be held as often as required by the medical staff. Only emergency medications authorized by the Regional Medical Director, such as inhalers and nitroglycerin, will be kept in a punitive cell.

19. Food – Food will be served in accordance with the appropriate policy addressing food services. Disposable utensils may be utilized. Meals will be served in the cells. Inmates on punitive will not be served seconds.

Alternative meal service may be provided to an inmate in punitive housing who uses food or food service equipment in a manner that is hazardous to self, staff, or other inmates. Alternative meal service is on an individual basis, is based on health and/or safety considerations only, meets basic nutritional requirements, and occurs with the written approval of the Warden and responsible health authority. The substitution period shall not exceed (7) seven days, but may be resumed, as warranted, following one regular tray, absent a special treatment plan.

20. Mental Health Counseling – Mental health counseling may be coordinated between mental health personnel and the Warden. A departmental mental health counselor must make rounds in punitive housing areas no less than three (3) times per week, on Monday, Wednesday, and Friday, and will ensure that all inmates reassigned from population to a lock-down status since the last round are seen. Additionally, mental health staff will see an inmate assigned to restrictive/punitive housing during normal working hours before leaving the unit and assess the inmate utilizing the Restricted Housing Review Form (MHS-1139.00) when notified of concerns by unit staff or medical staff. After normal working hours and on holidays or weekends, on-call mental health staff shall assess each inmate on whom notification has been received from unit staff or medical staff to determine if the inmate needs to be placed on treatment precaution status per mental health policy. Documentation must be placed in the electronic health record.

2[1]. Cleanliness/Grooming - Inmates assigned to punitive housing are expected to comply with the Department's policy concerning personal cleanliness and grooming for inmates. If an inmate's personal cleanliness and/or grooming falls below the Department's standard, the Chief of Security may order that necessary steps be taken to enforce compliance. Failure to abide by grooming standards is grounds for disciplinary action.

(Doc. No. 74-4 at 2-7).

AD 19-27 also provides that

> <u>Inmates serving punitive housing that exceeds thirty days will receive a forty-eight</u> <u>(48) hour relief at the end of each thirty (30) days of punitive housing assignment.</u> Inmate privileges as previously outlined in this policy will be restored during the forty-eight (48) hour relief period. An inmate's telephone privilege will not be restored during the forty-eight (48) hour relief if the privilege was suspended due to a conviction of disciplinary rule violation 02-5 or 09-15. Commissary purchases up to $10.00 may be made by an inmate only if the inmate's forty-eight (48) hour relief falls on their regularly scheduled commissary day, and will be limited to a quantity that can reasonably be consumed in forty-eight (48) hours. Inmates on 48 hour relief are only allowed to receive property that is allowed in Restrictive Housing.

(<u>Id</u>. at 8) (emphasis added).

The Maximum Security Unit has in place a policy, MS 10.02.1, that largely tracks the language of AD 19-27.   (Doc. No. Doc. No. 74-6).   The policy provides that "<u>48 hour relief</u> <u>periods are to be in housing outside the Punitive Isolation area if at all possible</u>."   (<u>Id</u>. at 6) (emphasis added).

It is undisputed that Plaintiff was in punitive isolation for 428 days.   (Doc. No. 5; Doc. No. 74-5 at ¶ 36).   Plaintiff maintains he was not given 48-hour relief periods during his time in punitive isolation.   (Doc. No. 71 at ¶ 4).   Defendants disagree.   (Doc. No. 79 at ¶ 4).

Plaintiff does acknowledge that prison records reflect he received 48-hour relief periods after roughly each 30 days he spent in punitive isolation.   (Doc. No. 74-1 at 46:21-63:6).   It is undisputed that Plaintiff was not removed from his cell during the 48-hour relief periods reflected in prison records.   (Doc. No. 76 at ¶ 43; Doc. No. 74-5 at ¶ 38; Doc. No. 74-8).

## IV.    Analysis

The Court first will address Defendants' Motion for Summary Judgment on the Issue of Exhaustion, and afterwards will reach the merits of the case.

A.      **Motion for Summary Judgment on the Issue of Exhaustion**

The Court granted Defendants leave to file a Motion for Summary Judgment on the issue of exhaustion outside of the deadline set in the Court's scheduling order.   (Doc. Nos. 14, 102, 107).   While the Court allowed the Motion to be filed, the Court declines to reach the Motion.

In Defendants' Motion for Leave to File, Defendants' argued that they had not interpreted Plaintiff's complaint as raising an Eighth Amendment claim regarding denial of outside activity. (Doc. No. 103 at 1-2).   Plaintiff's Amended Complaint clearly invokes both the Eighth and Fourteenth Amendments, and Plaintiff clearly alleged he was locked down in his cell with no exercise for 234 days.   For example, Plaintiff wrote in his Amended Complaint, "[Defendants Byers, Harris, and Payne . . . are . . . solely responsible for me being forced to spend 428 days straight in punitive isolation where I suffered the before mentioned conditions and these are said conditions that amounted to cruel and unusual punishment."   (Doc. No. 5 at 5).   One of the conditions mentioned was that "for 234 days of the 428 [Plaintiff] [has] been locked down for 24 hours without the opportunity to exercise."   (Id. at 4).   Further, Defendants' Brief in Support of Motion for Summary Judgment on the merits begins with the following explanation of the case: "[Plaintiff] initiated the instant lawsuit on February 24, 2021 with the filing of a *pro se* complaint . . . alleging the Defendants violated his Eighth and Fourteenth Amendment rights."   (Doc. No. 75 at 1).   Defendants also argued Plaintiff failed to establish an Eighth Amendment violation in connection with other alleged conditions of confinement in punitive isolation.   (Id. at 13).

Plaintiff alleged cruel and unusual punishment in his Amended Complaint.   Defendants' Brief in Support of the Motion for Summary Judgment on the merits acknowledged those claims and argued that those claims fail.   The length of the delay in Defendants seeking dismissal based on failure to exhaust was substantial.   The Court's initial scheduling order set the deadline for

such a motion on July 11, 2021.   (Doc. No. 14).   Defendants filed their Motion for Leave only on April 15, 2022.   (Doc. No. 102).   The nine-month delay was within Defendants' control.   The possibility of prejudice to Plaintiff was minimal.

Despite the lengthy delay, the Court believes Defendants acted in good faith—it appears that even for Plaintiff the focus of his lawsuit was not leaving his cell during his relief periods. During his deposition, Plaintiff explained: "[T]he root of my argument is cruel and unusual punishment.   Due to them violating this 48-hour relief policy . . . ."   (Doc. No. 74-1 at 35:3-9). Plaintiff also testified: "That's what this lawsuit is all about now because it's starting to come out. That shows right there 48-hour relief does not end restrictive housing because the inmate is not returned to general population during this time.   So when I'm on 48, I'm supposed to be going to general population." (Id. at 43:10-15).   Plaintiff also testified that he "was supposed to have been moved out of that cell every 30 days.   For all of them days straight they just left me in that cell . . . ."   (Id. at 65:5-6).   Further, in his summary judgment papers, Plaintiff repeatedly referred to not being moved from punitive isolation, "thus [Plaintiff] received no relief from punitive housing." (Doc. No. 70 at ¶ 16, for example; Doc. No. 71 at ¶¶ 1, 4).

Even the three grievances Plaintiff filed focused on his removal from his cell.   Grievance MX-20-00700, filed on April 14, 2020, reflects only that Plaintiff is left in his isolation cell for years at a time.   (Doc. No. 108-4).   In Grievance MX-20-02263, filed December 23, 2020, Plaintiff grieves that he has not been removed from punitive isolation, that he has not received notice of his 48-hour relief, and has not been allowed to access news media.   (Doc. No. 108-5). Lastly, in Grievance MX-21-00224, filed February 2, 2021, Plaintiff complains about not being removed from his isolation cell, which is denying Plaintiff access to newspapers and personal property from the mailroom.   (Doc. No. 108-6).   There is no dispute that Plaintiff did not grieve

lack of exercise, commissary privileges, law library access, or any of the other conditions he raises in his Amended Complaint.

Nonetheless, the length of the delay coupled with Defendants' reason for the delay—that they did not realize Plaintiff was making an Eighth Amendment claim—weighs against the Court considering Defendants' affirmative defense at this point.  Chorosevic v. MetLife Choices, 600 F.3d 934, 946-47 (8th Cir. 2010).  In retrospect, the Court finds Defendants did not meet the excusable neglect standard.  See Id.  For this reason, while the Court initially granted Defendants leave to file, the Court will not address the issue of exhaustion and denies Defendants' Motion (Doc. No. 107) as moot.

### B.    The Parties' Motions for Summary Judgment on the Merits

Plaintiff alleges Defendants violated his constitutional rights during his punitive isolation by not removing him from his cell during his 48-hour relief periods, among other things.   Plaintiff explained at deposition that the "root of [his] argument is cruel and unusual punishment."   (Doc. No. 74-1 at 35:3-4).   Plaintiff brought his claims against Defendants in the personal and official capacities.   Plaintiff and Defendants have filed competing Motions for Summary Judgment on the merits.

### 1.    Official Capacity Claims

Plaintiff's official capacity claims are the equivalent of claims against the state of Arkansas; as such, Plaintiff's official capacity damages claims are barred by Eleventh Amendment.  Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989).   Accordingly, Defendants' Motion is granted in connection with Plaintiff's official capacity damages claims.

### 2.      Individual Capacity Claims

In his Amended Complaint, Plaintiff asserts that adequate forty-eight hour relief includes being removed from his punitive isolation cell during the relief period.   He also alleges poor conditions while in punitive isolation such as heat, cold, physical abuse, and unsanitary conditions. (Doc. No. 5).   Further, Plaintiff alleges that of the 428 days he was in punitive isolation, he was denied the opportunity to exercise on 234 days.   (Id. at 4).   Plaintiff asserts Defendants violated prison policy, as well as Plaintiff's rights under the Eighth and Fourteenth Amendments, through their actions.

### a.      Prison Policy

To the extent Plaintiff bases his claims on the violation of prison policy, his allegations fail to state a § 1983 claim on which relief may be granted.   Gardner v. Howard, 109 F.3d 427, 430 (8th Cir. Cir. 1997).

### b.      Eighth Amendment Claims

"A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element." Revels v. Vincenz, 382 F.3d 870, 875 (8th Cir. 2004) (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)).   "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the 'minimal civilized measure of life's necessities.'"   Id. (quoting Rhodes v. Chapman, 452 U.S. 337, 342 (1981)).   In addition, the defendant's conduct also must also demonstrate a subjective state of mind that indicates deliberate indifference to the health or safety of the prisoner.   Id. (citing Estelle v. Gamble, 429 U.S. 97, 104 (1977)).   To succeed on a deliberate indifference claim, a plaintiff must show that "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety." Id. (citing Farmer v. Brennan, 511 U.S. 825, 835 (1994)).

### c.    Fourteenth Amendment Claims

Plaintiff also raised claims under the Fourteenth Amendment.   The safeguards of the due process clause are triggered when a protected liberty interest is at issue.   Sandin v. Conner, 515 U.S. 472, 484 (1995); Phillips v. Norris, 320 F.3d 844, 846-47 (8th Cir. 2003).   A protected liberty interest "may arise from two sources-the Due Process Clause itself and the laws of the States." Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989).   State law may create a liberty interest if "state statute or regulation involved uses mandatory language and imposes substantive limits on the discretion of state officials."   Snodgrass v. Robinson, 512 F.3d 999, 1003 (8th Cir. 2008).

### d.    Qualified Immunity

Defendants argue they are protected from liability in their individual capacities by qualified immunity, which protects officials who act in an objectively reasonable manner. It may shield a government official from liability when his or her conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).   Qualified immunity is a question of law, not a question of fact.   McClendon v. Story County Sheriff's Office, 403 F.3d 510, 515 (8th Cir. 2005).   Thus, issues concerning qualified immunity are appropriately resolved on summary judgment. See Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (the privilege is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.").

To determine whether defendants are entitled to qualified immunity, the courts generally consider two questions: (1) whether the facts alleged or shown, construed in the light most favorable to the plaintiff, establish a violation of a constitutional or statutory right; and (2) whether

13

that right was so clearly established that a reasonable official would have known that his or her actions were unlawful.   Pearson v. Callahan, 555 U.S. 223, 232 (2009).[1]   Defendants are entitled to qualified immunity only if no reasonable fact finder could answer both questions in the affirmative.   Nelson v. Correctional Medical Services, 583 F.3d 522, 528 (8th Cir. 2009).

### i.    Removal from Cell

To a large extent, Plaintiff's claims turn on what "48-hour relief" means.   Does that term mean that an inmate must be physically removed from his punitive isolation cell?   Or can an inmate receive sufficient relief while remaining confined in punitive isolation?

In Finney v. Hutto, the Court of Appeals for the Eighth Circuit held that "the policy of sentencing inmates to indeterminate periods of confinement in punitive isolation is unreasonable and unconstitutional."   410 F. Supp. 251, 278 (E.D. Ark. 1976), aff'd, 548 F.2d 740 (8th Cir. 1977), aff'd, 437 U.S. 678 (1978).   Plaintiff believes Finney requires an inmate be physically removed from his punitive isolation cell and housed elsewhere during relief periods.   (Doc. No. 5; Doc. No. 71 at ¶¶ 1, 4).   For example, in a Declaration in support of Plaintiff's Motion for Summary Judgment, Plaintiff explains that "[o]n 1/27/20, my status within the computer system changed automatically to 48-hour relief but my physical location remained the same.   Thus I received no relief from punitive housing."   (Doc. No. 70 at ¶ 16.)   Plaintiff makes the same statement as to his other relief periods reflected in ADC documents.

---

[1] Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."   Nelson, 583 F.3d at 528 (quoting Pearson v. Callahan, 555 U.S. at 236).

But the Court of Appeals for the Eighth Circuit has indicated that the Constitution does not necessarily require that an inmate be moved from his cell during a relief period.   See Ford v. Kelley, case no. 5:17-cv-00270-JM-JJV, 2019 WL 1906255, at *4 (E.D. Ark. April 9, 2019), aff'd 2019 WL 6464027 (8th Cir. 2019).   Rather, the analysis is not limited to where the inmate is confined, but extends to how he is confined.   The Court of Appeals for the Eighth Circuit affirmed the district court's entry of summary judgment in defendants' favor where a prisoner remaining in his punitive isolation cell during relief periods had privileges restored during relief.   Id.   In light of Ford v. Kelley, instead of looking merely at where Plaintiff was housed, the Court must also consider whether Plaintiff's privileges were restored during relief periods.

The ADC and Maximum Security Unit had in place policies governing punitive isolation. Both Administrative Directive 19-27 and MS 10.2.1 describe forty-eight-hour relief as a period in which an inmate's privileges will be restored.   (Doc. No. 74-4 at 8; Doc. No. 74-6 at 6.)   On April 20, 2022, the Court held an evidentiary hearing in connection with the pending motions for summary judgment.   At the hearing, Defendant Payne explained that

> [o]n your 48 hour relief, your privileges are restored.   Those privileges you lost in disciplinary court are restored to you.   So, basically, if you lost your commissary privileges, those are restored to you; if you lost your visitation privileges, those are restored to you.   So, whatever you lost in disciplinary court is what can be restored to you.

(Doc. No. 117 at 49:18-25).

At the hearing, Plaintiff called witness Alonzo Hampton, a fellow inmate who spent a significant amount of time in punitive isolation at the same time Plaintiff did.   Mr. Hampton testified, in part, as follows:

> It wasn't policy that you had to be removed from punitive isolations, as long as your phone was cut on, and if your – if your store – if your 48 fell on your store days, you received your commissary, that entitled you to some kind of relief. But a

15

> lot of us had numbers removed from our list due to phone charges, so we wasn't able to utilize or operate the phone.   And then, sometime in punitive isolation, the inmates tear the phone up, so there's no phone available.

(Doc. No. 117 at 31:1-9).   This explanation is consistent with the ADC's and Maximum Security Unit's written policy regarding relief periods, as well as consistent with Defendant Payne's testimony.

Defendant Byers also explained that inmates are made aware of their relief periods either by an informal written notice not requiring a signature that was given to the inmate, or simply by inmates tracking the date on which the 48-hour relief would be due.   (Doc. No. 117 at 80:6-82:1). Additionally, an inmate's relief period is reflected on the prison's EOMS, or offender management system.   (Id. at 81:20-21).

Despite the policy mandating that privileges be restored during the relief periods, Plaintiff alleges he was denied the following: access to news and media; access to the law library; commissary; visitation; personal property; and telephone privileges.   The record reflects Plaintiff repeatedly lost commissary, telephone, and visitation privileges in connection with the disciplinaries he received.   (Doc. No. 74-8).

### Commissary

Plaintiff alleged he was denied commissary privileges during his relief period.   ADC records reflect Plaintiff's relief periods and commissary purchases as follows:

| 48-hour Relief Dates | Commissary Purchases |
|---|---|
| 1/27/2020—1/29/2020 | 1/8/2020 – two entries<br><br>1/22/2020<br><br>1/29/2020—two entries |
| 2/26/2020—2/28/2020 | 2/26/2020 |

| | |
|---|---|
| 3/30/2020—4/1/2020 | 3/3/2020<br><br>3/30/2020 |
| 4/30/2020—5/1/2020 | 5/1/2020—two entries |
| 5/29/2020—6/1/2020 | 6/1/2020 |
| 6/30/2020—7/2/202 | 6/8/2020<br><br>7/1/2020 |
| 7/31/2020—8/3/2020 | 7/8/2020<br><br>7/20/2020<br><br>7/22/2020 |
| 8/31/2020—9/2/2020 | 9/1/2020 |
| 10/1/2020—10/5/2020 | 10/5/2020<br><br>10/12/2020 – two entries<br><br>10/19/2020 |
| 10/30/2020—11/4/2020 | 11/2/2020 |
| 12/1/2020—12/4/2020 | 12/3/2020 |
| 1/5/2021—1/7/2021 | 1/6/2021 |
| 2/2/2021—2/4/2021 | 2/2/2021—four entries |

(Doc. No. 74-9; Doc. No. 74-10).

At the April 20, 2022 evidentiary hearing, Plaintiff testified that he never knew when he had a relief period because he was never notified when his relief started.   (Doc. No. 117 at 9:1-16, 9:1-5).   Commissary records, however, reflect that Plaintiff's purchases coincided with his relief periods, with purchases sometimes also made when Plaintiff was not on relief.   (Doc. No. 74-9; Doc. No. 74-10).   Additionally, at the evidentiary hearing Plaintiff acknowledged that he was allowed commissary during his 48-hour relief periods.   (Doc. No. 117 at 8:10-16).   The Court also notes Plaintiff did not complain about any commissary-related issues in his grievances.

17

Additionally, there is no constitutional right to a prison gift or snack shop.   Tokar v. Armontrout, 97 F.3d 1078, 1083 (8th Cir. 1996).   To the extent Plaintiff complained that he was limited to spending $10 a month at the commissary (Doc. No. 5 at 5), that limitation does not rise to the level of a violation.

### Access to News and Media

Administrative Directive 19-27 provides that "[i]nmates will not be able to receive newspapers or magazines in punitive housing or on punitive restriction."   (Doc. No. 74-4 at 2). However, "[d]uring their forty-eight (48) hour relief, inmates will be allowed to receive the two (2) most current newspapers and magazines on a one-for-one exchange basis."   (Id.).

Plaintiff alleges he was denied access to news and media during periods of 48-hour relief. (Doc. No. 5; Doc. No. 108-5 at 1).   Plaintiff believes Administrative Directive 19-27 requires officers to take the initiative to bring an inmate newspapers or magazines during the inmate's 48-hour relief period, without having been requested to do so.   (Doc. No. 74-1 at 24:22-25:8). During his deposition, Plaintiff explained his understanding of the policy as follows:   "It don't say nowhere in that policy that I should ask.   The policy don't state the inmate should ask for these things.   These things is entitled, you know what I'm saying.   They're supposed to be given to you."   (Id. at 35:23-36:1).

Plaintiff acknowledged that the prison library has a newspaper subscription.   (Id. at 25:21-23).   Plaintiff also acknowledged that no Defendant ever prevented him from getting a newspaper subscription.   (Id. at 25:9-20).   And Plaintiff acknowledged that he never tried to get a subscription.   (Id.)   Plaintiff maintains Defendants violated his rights "because they don't give us no newspaper or no magazine."   (Id. at 24:5-9).   Plaintiff also maintains that he was denied

access to the news because he was not allowed to have batteries to power his radio.   (Doc. No. 71 at ¶ 9).

Despite Plaintiff's deposition testimony, in his Response to Defendants' statement of material facts not in dispute Plaintiff denied not having a newspaper subscription, among other denials.   (Doc. No. 76 at ¶¶ 55-59; Doc. No. 82 at ¶¶ 55-59).

Federal Rule of Civil Procedure 56(c)(1) provides:

A party asserting that a fact cannot be or is generally disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information,, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1).   See also <u>Glover v. Bostrom</u>, case no. 20-2884, 2022 WL 1087586, at *4 (8th Cir. Apr. 12, 2022) (an unsubstantiated allegation is not enough to raise a genuine dispute) (citing <u>Forrest v. Kraft Foods, Inc.</u>, 285 F.3d 688, 691 (8th Cir. 2002).   Plaintiff did not support his denial by citing to the record or otherwise offering any evidence in support of his denials.

Plaintiff was entitled to access news during relief periods by purchasing magazine and newspaper subscriptions, requesting them from the library, or having family or friends send him copies.   The Court notes that mail is not restricted for inmates serving a sentence in punitive isolation.   (Doc. No. 74-4 at 2) ("Inmates in punitive housing or on punitive restriction will be allowed to send and receive letters on the same basis as inmates in the general population."); (Doc. No. 74-6 at 5). Plaintiff, however, did not take advantage of any of these methods.   Moreover, although prisoners have a First Amendment right to receive published materials subject to

reasonable limitations, that right does not create an affirmative duty on prisons to provide news publications to inmates.   Collins v. Burl, No. 2:11CV40-DPM-BD, 2011 WL 2457532, at 1 (E.D. Ark. June 17, 2011) (citing Pell v. Procunier, 417 U.S. 817, 822 (1974)).   Plaintiff's failure to avail himself of the possible means to receive newspapers and magazines is not the equivalent of being denied access to the news and media.

**Access to the Law Library**

Pursuant to Administrative Directive 19-27 and MS 10.02.1, "[a]fter having been in punitive housing for twenty days, inmates may order legal materials from the law library if just cause or adequate need arises for legal material to be delivered once per week."   (Doc. No. 74-4 at 4; Doc. No. 74-6 at 4).   The Directive contains the exception that "[l]egal materials will be made readily accessible to those inmates who need to meet statutory or court-imposed deadlines." (Id.).   The Court notes that law library access is available to inmates after twenty days in punitive isolation; access is not limited to relief periods.

Defendants maintain Plaintiff requested and received material from the law library while Plaintiff was in punitive isolation.   Defendants provided the following dates on which Plaintiff requested or received material: February 12, 2020; May 18, 2020; February 10, 22, and 24, 2021; and March 12, 2021.   (Doc. No. 76 at ¶ 64).   Plaintiff denies Defendants' assertion.   (Doc. No. 82 at ¶ 64).   But Defendants also provided a supply history record for Plaintiff, showing various materials supplied.   (Doc. No. 74-11).

Plaintiff has not provided evidence beyond his own statement to discredit the records provided by Defendants.   The Court also notes that the grievances Plaintiff filed do not include any complaint regarding lack of access to legal material.   (Doc. Nos. 108-4, 108-5; 108-6); Glover, 2022 WL 1087586, at *4.   Further, Plaintiff has not explained why he requested legal

20

material, which legal material he sought, which legal material he was denied, or any actual injury he suffered by any denial.   Hartsfield v. Nichols, 511 F.3d 826, 831-32 (8th Cir. 2008).

## Visitation

Plaintiff alleged he was denied visitation, including phone calls.   In Plaintiff's ADC Inmate Case Notes, there is one instance noted when Plaintiff complained about not being able to use the telephone during his 48-hour relief.   (Apr. 20, 2022 hearing, Ex. 7).   The notes reveal that on October 19, 2020, Plaintiff asked to use the phone to call home when he had been denied phone privileges during relief.   (Id. at 1).   Yet the Case Notes show that during Plaintiff's relief period on October 1-2, Plaintiff made 38 connected calls.   (Id.).   Staff then failed to restrict Plaintiff's telephone status, and between October 3-5, Plaintiff made an additional 57 connected calls.   (Id.).   The Inmate Case Notes reflect that Plaintiff's request to use the phone again was denied.   (Id.).

The Court once again notes that Plaintiff did not complain about any visitation-related issue in his grievances.   And in his Amended Complaint, Plaintiff did not raise denial of visitation as an issue.   At Plaintiff's deposition and in the April 20 evidentiary hearing, Plaintiff maintained he was denied visitation.   At the hearing, Defendant Byers testified that visitation was at the warden's discretion.   (Doc. No. 117 at 74:11-18).   He did not recall having a request for visitation from Plaintiff.   (Id. at 14-17).   During his deposition, Plaintiff explained that he had not "had a visitation in six years," which is much longer than the period at issue in this lawsuit.   (Doc. No. 74-1 at 85:2-3).

## Personal Property

Though not mentioned in his Complaint, Plaintiff alleged in Grievance MX-21-00224 that by not being removed from punitive isolation, he was being denied access to personal property.   (Doc. No. 74-7 at 3).   Plaintiff also testified at the evidentiary hearing that he "never received

21

[his] property."   (Doc. No. 117 at 8:10-13).   However, Plaintiff then later testified that he did get his books back during his time in punitive isolation.   (Id. at 14:2-7).   Defense counsel presented Plaintiff with an ADC personal property record dated May 29, 2020, that recorded that certain personal property was returned to Plaintiff on that date.   (Id. at 16:10-15).   Based on the personal property record, it appears that as of May 29, 2020, Plaintiff was allowed to have certain books, shoes, and religious material, even though personal property generally was not allowed while an inmate was in punitive isolation.   (April 20, 2022 hearing, Ex. 1).   Plaintiff has not explained which other property he claims he was denied.

### Privileges Restored

Evidence in the record demonstrates that Plaintiff purchased commissary items during his relief periods, used the telephone, had access to news and media, was allowed personal property, and requested and received material from the law library.   The record supports a finding that Plaintiff's punitive restrictions were lifted during his relief periods.   In Ford v. Kelley, mentioned above, the Court of Appeals for the Eighth Circuit affirmed the granting of summary judgment in defendants' favor under similar factual circumstances.   See Ford, 2019 WL 1906255, at *4. Here, as in Ford, Plaintiff has failed to establish an Eighth Amendment violation.

To the extent Plaintiff alleged that the failure to remove him from his punitive isolation cell during relief periods constituted a Fourteenth Amendment violation, that claim also fails.   The United States Supreme Court has recognized that states may, under certain circumstances, create liberty interests that are protected by the Due Process Clause.   Sandin v. Conner, 515 U.S. 472, 483-84 (1995) (citing Board of Pardons v. Allen, 482 U.S. 369 (1987)).   "But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force,

nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 484 (internal citations omitted). Because ADC policy does not require the removal of an inmate from a punitive isolation cell during relief periods, the state has not created a liberty interest in removal. Even if a liberty interest had been created, the failure to move an inmate to another cell could not be considered "a dramatic departure from the basic conditions" of confinement because the relief period entails the restoration of privileges; a relief period entails the "basic conditions" of confinement. Id. at 485.

### Why Plaintiff Was Not Moved From His Cell

While the Court finds that Defendants did not violate Plaintiff's Eighth or Fourteenth Amendment rights by not removing him from his cell, Plaintiff's allegations nonetheless are troublesome. The Court held the April 20, 2022 evidentiary hearing to develop the record as to why Plaintiff was not moved, among other things. During the hearing, Defendant Payne testified that Plaintiff was not moved because of a lack of available beds in the prison during Plaintiff's relief periods, and because movement throughout the prison was restricted from April 2020 through March 2021 as a Covid-19 precaution. (Doc. No. 117 at 51:23-52:15). Defendant Byers's testimony was consistent with Defendant Payne's testimony. Defendants' supplemented their Motion with the number of beds available during each of Plaintiff's 48-hour relief periods. (Doc. Nos. 115-1; 115-2; 115-3). The records reflect that in January 2020, between the two restrictive housing barracks where inmates in punitive isolation could have been housed during relief, there were four beds available; in February 2020, there was one bed available; and in March 2020, there were two beds available to accommodate all inmates on relief. Defendant Byers further explained that the restrictive housing barracks also served as quarantine barracks, and cells had to be held open for inmates who tested COVID-19 positive and needed to quarantine. (Doc.

No. 115-1 at ¶ 6).   And from late April 2020, "due to COVID 19, there was no movement of inmates between barracks unless it was for a security reason such as an altercation, PREA, or serious contraband."   (Id. at ¶ 5).

The Court notes that Covid-19 precautionary measures were at play throughout the vast majority of Plaintiff's time in punitive isolation.   The Court is not aware of any clearly established law that would have put a reasonable officer on notice that not removing Plaintiff from his cell was a violation during the times relevant to Plaintiff's claims.   As such, to the extent any violation may have occurred as a result of Plaintiff not being moved, Defendants are entitled to qualified immunity on that point.

### ii.   Additional Complaints About Confinement in Punitive Isolation

Beyond Plaintiff's allegation that he was not removed from his cell and that he was denied privileges, Plaintiff complains of other aspects of his confinement in punitive isolation.

### Deliberate Indifference to Exercise Needs

Plaintiff alleges he was "locked down" and unable to exercise for 234 out of 428 days. (Doc. No. 5 at 4).   Defendants maintain there was no constitutional violation.   In support of their Motion, Defendants provided the Declaration of Defendant Rodney Ford.   (Doc. No. 74-13). According to Defendant Ford, "prior to Covid-19, punitive isolation inmates were afforded the opportunity to exercise outside their cell in accordance with the unit's policy."   (Id. at ¶ 29). Plaintiff denies this allegation without supporting his denial.   (Doc. No. 76 at ¶ 75; Doc. No. 82 at ¶ 75).

Defendants provided yard call logs showing days and times when inmates in restrictive punitive housing left their cells.   The Court has reviewed these records.   On the days an inmate

accepted yard call, the logs note the in and out times.   (Doc. No. 91).    As to Plaintiff, the yard

call logs show as follows:

| | Dates Plaintiff Accepted Yard Call | Dates Plaintiff Refused Yard Call | Dates Yard Call Cancelled | Dates With Insufficient or No Information |
|---|---|---|---|---|
| February 2020 | 3, 7, 14, 24, 25, 26 | 19, 21, 27 | 13, 18 | 1, 2, 4 - 6, 8-12, 15-17, 20, 22-23, 28 |
| March 2020 | 6, 9, 12 | | | 1, 2-5, 7-8, 10-11, 13-31 |
| April 2020 | 7, 8, 17, 21, 22 | | 23 27-30 (treatment precautions) | 1-6, 9, 10-16, 18-20, 24-26 |
| May 2020 | 5, 11, 18, 27, 29 | | | 1-4, 6-10, 12-17, 19-26, 28, 30 |
| June 2020 | 2, 4, 5, 9, 10, 11, 15, 17, 18, 24 | | 8 | 1, 3, 6-7, 12-14, 16, 19-23, 25-30 |
| July 2020 | 1, 20, 21, 22, 24, 27, 29 | 31 | 30 | 2, 3-19, 23, 25-26, 28 |
| August 2020 | 10, 12, 13, 20, 21, 24 | 3, 4, 7, 11, 17, 19, 26, 28 | 5, 14, 27, 31 | 1-2, 6, 8-9, 15-16, 18, 22-23, 25, 29-30 |
| September 2020 | 14, 30 | 3, 11 | 2, 10 | 1, 4-9, 12-13, 15-29 |
| October 2020 | 6, 8, 14, 20, 21 | 5, 16, 22 | 2 | 1, 3-4, 7, 9-13, 15, 17-19, 23-30 |
| November 2020 | 3 | 2 | 9, 10, 12, 13, 16, 17, 18, 19, 20 | 1, 4-8, 11, 14-15, 21-30 |

(Doc. No. 91; Doc. No. 87-5 at ¶¶ 9-11).Defendants could not locate yard call records for the

months of December 2020, and January through March, 2021.   (Doc. No. 92).

In Rahman X v. Morgan, the plaintiff, an Arkansas Department of Corrections inmate, was

not allowed to go outside to exercise for three months.   300 F.3d 970 (8th Cir. 2002).   Taking

into account that the plaintiff was allowed activity outside of his cell, even if not outdoors, the

Court of Appeals for the Eighth Circuit found the three-month deprivation of activity outdoors was

not "sufficiently serious to establish an Eighth Amendment violation."   *Id*. at 974 (8th Cir. 2002).

Here, though, Plaintiff alleges he was locked down in his cell for 234 days without exercise or out-

of-cell activity.

The record clarifies that the 234 days Plaintiff mentioned were not consecutive. There was no month for which records exist in which Plaintiff had no outdoor/out-of-cell activity.

Further, unlike in 2002 when <u>Rahman X</u> was decided, from early 2020 forward our nation has been fighting to contain Covid-19. Prisons did not escape this battle. As explained by Defendants, by April 2020 the ADC had implemented Covid-19 restrictions that limited the movement of inmates within the units. (Doc. No. 87-3 at ¶ 3). The restrictions remained in place until April 2021. (<u>Id</u>.). While the Covid-19 restrictions were in place, ADC staff "continued to make efforts to conduct yard-call because this was often the only time that the inmates were allowed out of their cells." (<u>Id</u>. at ¶ 7).

At times yard call was cancelled because of Covid-related staffing shortages. (<u>Id</u>.). Defendant Payne testified that staffing levels were down by 50%, while Defendant Byers testified that at the Maximum Security Unit, staffing levels were down by 65%. (Doc. No. 117 at 53:6-24; 83:4-11). As described by Defendant Payne, "When we escort inmates to the yard, we have to have two officers per every inmate that we take out. So, they're – they're escorted by two officers every time. Every time a[n] inmate in restrictive housing is moved from one place to the other, they're escorted by two officers." (<u>Id</u>. at 55:2-7). As Defendant Byers explained at the April 20 hearing, "there were days we had to choose between, 'Hey, we got to get this cell block cleaned up or – or we gotta run yard.' Those were the choices we had to make. So, generally, we go for cleanliness and healthiness." (<u>Id</u>. at 83:15-19). Again, according to Defendant Byers, staffing at the Maximum Security Unit was down by 65%. (<u>Id</u>. at 83:4-11).

The record also reflects that at other times yard call was cancelled because of the weather. (Doc. No. 91). And, as set out above, at times Plaintiff refused yard call. (<u>Id</u>.) The Court notes that Plaintiff disputes this fact. Fed. R. Civ. P. 56(c)(1); <u>Glover</u>, 2022 WL 1087586, at *4.

Covid-19 precautionary measures and Covid-related staffing shortages were an issue throughout most of Plaintiff's time in punitive isolation and contributed to yard call not taking place. The Court is not aware of any clearly established law that would have put a reasonable officer on notice of a violation resulting from not taking inmates to yard call when Covid-19 precautions and Covid-related staffing shortages were the underlying reason. As such, to the extent any violation may have occurred, Defendants are entitled to qualified immunity on this point.

There is no dispute that the "lack of exercise may be a constitutional violation if one's muscles are allowed to atrophy or if an inmate's health is threatened." Wishon v. Gammon, 978 F.2d 446, 449 (8th Cir. 1992). Plaintiff's allegations include denial of exercise. Defendants have explained that Plaintiff was housed in a one-man cell, and that Plaintiff was able to exercise inside of his cell. (Doc. No. 87-3 at ¶ 8). At the evidentiary hearing, Plaintiff testified that his cell was too small to allow him to exercise. (Doc. No. 117 at 10:19-21). Defendants provided the dimensions of Plaintiff's cell. (Apr. 20, 2022 hearing Ex. 4). With 63.54 unencumbered square feet in his cell, and where the length of the inner cell was 8.6 feet, the Court finds no genuine issue of material fact; the dimensions of Plaintiff's cell were large enough for Plaintiff to exercise inside of his cell. And Plaintiff has not alleged that any ADC official prevented him from doing so.

**Shower and Sleeping Mat Claims**

Plaintiff claims that he was limited to three showers a week and that his sleeping mat was taken for 12 hours a day. (Doc. No. 5; Doc. No. 74-1 at 35:10-15, 91:11-13). These allegations do not rise to the level of a constitutional violation. Abernathy v. Perry, 869 F.2d 1146 (8th Cir. 1989) (no Eighth Amendment violation where plaintiff allowed to shower twice per week); Gardner v. Emsweller, case no. 6:20-cv-06006, 2020 WL 1696091, at *2 (W.D. Ark. Mar. 13,

2020) ("The Court is not aware of any authority in this or any other Circuit which requires inmates without specific medical needs to be permitted access to a sleeping mat twenty-four hours a day.") (and cases cited therein).

### Temperatures in Plaintiff's Cell

Plaintiff alleged that the temperatures in his cell were too cold in winter and too hot in summer.   In support of their Motion, Defendants submitted logs of the temperature in Plaintiff's barracks.  (Doc. No. 87-7).   The logs cover the period from January 1, 2020 to March 5, 2021. (Id.)   While some days are missing from the records, the logs in evidence do not reflect that Plaintiff's barracks were ever extremely hot or cold.   (Id.)   Generally, the logs reflect temperatures between the mid-60s and mid-70s.   (Id.)   Plaintiff has not come forward with evidence to prove that any temperatures to which he was exposed were so extreme as to rise to the level of a constitutional violation.

### Sewage in Plaintiff's Cell

Plaintiff alleged that sewer water routinely flooded his cell.   (Doc. No. 5 at 5). Defendant Culclager searched maintenance records for the period of January 2020 through March 2021 in connection with Plaintiff's claim that his cell flooded with sewer water.   Defendant Culclager found no record that Plaintiff's cell ever flooded at any time relevant to this case. (Doc. No. 87-5 at ¶ 19).   Further, there were no maintenance records indicating that Plaintiff's cell flooded.   (Id.).   Beyond his own statements, Plaintiff has not presented evidence that his cell flooded.

### Physical Abuse

According to Plaintiff, he was physically abused while in punitive isolation.   (Doc. No. 5 at 5).   Plaintiff submitted two grievances he filed in connection with the alleged abuse.   (Doc.

No. 71 at 24, 25).   Plaintiff submitted Grievance MX-21-01186 after he filed this lawsuit.   (Id. at 24).   As such, the events complained of in that grievance are not at issue in this case.   Grievance MX-19-01818, the other grievance filed, alleges that a Sergeant Wooten retaliated against Plaintiff for Plaintiff exposing Sergeant Wooten's "undercover sex life" with another ADC official.   (Id. at 25).   Sergeant Wooten allegedly retaliated against Plaintiff by using excessive force while escorting Plaintiff back from the shower.   (Id.).   This grievance does not support Plaintiff's claim that he was being abused as part of his confinement in punitive isolation; the abuse Plaintiff alleged was retaliation for Plaintiff's unrelated actions.   And Plaintiff otherwise has not come forward with evidence to support his claim.

## V.       Summary

Where, as here, Defendants have moved for summary judgment, Plaintiff "was required 'to discard the shielding cloak of formal allegations and meet proof with proof by showing a genuine issue as to a material fact.'"   Fatemi v. White, 775 F.3d 1022, 1046 (8th Cir. 2015) (internal citation omitted).   Plaintiff has not, however, met proof with proof to establish facts in dispute that would preclude partial summary judgment in Defendants' favor.   Wilson v. Miller, 821 F.3d 963, 970 (8th Cir. 2016) (allegations must be substantiated with sufficient probative evidence); Bolderson v. City of Wentzville, Missouri, 840 F.3d 982, 986-87 (8th Cir. 2016) (noting plaintiff's duty to meet proof with proof in affirming summary judgment in defendant's favor).

Plaintiff has failed to establish a genuine issue of fact that precludes entry of summary judgment in Defendants' favor, and has failed to establish that he is entitled to the summary judgment he seeks.   The Court again notes that Defendants are entitled to qualified immunity where Covid-related restrictions or Covid-related staffing shortages gave rise to the issues of which Plaintiff complained.

**VI.    Conclusion**

IT IS, THEREFORE, ORDERED that:

1.      Plaintiff's Motion for Summary Judgment (Doc. No. 68) is DENIED.

2.      Defendants' Motion for Summary Judgment on the merits (Doc. No. 74) is GRANTED.

3.      Defendants' Motion for Summary Judgment on the issue of exhaustion (Doc. No. 108) is DENIED as moot.

4.      Plaintiff's claims are DISMISSED with prejudice.

5.      This case is DISMISSED.

IT IS SO ORDERED this 16th day of May, 2022.

_____
JEROME T. KEARNEY
UNITED STATES MAGISTRATE JUDGE